IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

JESSE GUZMAN,

      Defendant.

CIVIL ACTION NO.
1:17-CR-00405-TWT-LTW-2

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION AND ORDER CERTIFYING CASE READY FOR TRIAL

This case is presently before the Court on Defendant Jesse Guzman's Motion to Suppress Search and Seizure (Doc. 40), Motion to Suppress Evidence (Doc. 41), and Motion for Bill of Particulars.  (Doc. 44).  Having considered Defendant's motions, testimony presented at the evidentiary hearing, the parties' briefs, and all the evidence submitted, and for the reasons set forth below, this Court **RECOMMENDS** that Defendant's motions be **DENIED**.  (Docs. 40, 41, 44).

## BACKGROUND

### I.   PROCEDURAL HISTORY

Defendant and Juan Tenorio Castro ("Castro") (collectively, "Defendants") were arrested on October 25, 2017, following a traffic stop.  (Tr. of June 5, 2018 Evid. Hr'g, hereinafter "Tr.," 60-61).  A criminal complaint in the North District of Georgia was

issued the following day, finding probable cause that Defendants conspired to distribute heroin in violation of 21 U.S.C. §§ 841, 846. (Doc. 1). Defendant attended a preliminary hearing and bond hearing on October 31, 2017 (Doc. 12), and he was subsequently released from custody after posting bond. (Docs. 14, 15). A grand jury returned a two-count indictment against Defendants on November 20, 2017, charging Defendants with conspiracy to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846; and possession with intent to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(A), and 18 U.S.C. § 2. (Doc. 17). Castro entered a guilty plea and is serving a 128-month sentence. (Docs. 62, 64). Defendant was arraigned on December 19, 2017, and pleaded not guilty to the charges in the indictment. (Doc. 31). Defendant filed six pretrial motions on February 13, 2018, including a Motion to Suppress Search and Seizure, Motion to Suppress Evidence, and Motion for a Bill of Particulars. (Docs. 40, 41, 44). The Court held an evidentiary hearing on June 5, 2018. (Doc. 63). Defendant filed a Post-Hearing Brief in support of his motions. (Doc. 44). The Government filed a Response (Doc. 74), to which Defendant filed a Reply. (Doc. 77).

## II.   FACTUAL BACKGROUND

On October 24, 2017, Drug Enforcement Agency (DEA) Task Force Officer (TFO) Tremell Harvey called a number in Mexico to arrange a heroin buy as part of an undercover operation. (Tr. 5-6). Someone else had already negotiated the transaction, and a co-worker gave TFO Harvey the phone number to call. (Tr. 4-5). A man

2

answered TFO Harvey's call and asked if TFO Harvey wanted "two lunch."  (Tr. 5). TFO Harvey stated he was looking for four because he knew the deal was structured to buy four kilograms of heroin for $52,000 each.  (Tr. 5).  The man agreed and instructed TFO Harvey to give him a call the next day when TFO Harvey was in Atlanta.  (Tr. 5). When TFO Harvey called the number in Mexico on October 25, 2017, the man gave TFO Harvey a number with an Atlanta area code, and said that "they will give you a call."  (Tr. 6, 13).

TFO Harvey received a phone call from the Atlanta number from a man the officers later identified as Defendant.  (Tr. 6).  The DEA Task Force intended to have the transaction take place off Pleasantdale Road in Gwinnett County, but when TFO Harvey proposed the location, the man on the call said he would have to consult with "his people."  (Tr. 7).  When the man called back, he said that TFO Harvey would have to meet him on Mableton Parkway, an hour and a half away.  (Tr. 7).  While TFO Harvey was on the way to Mableton, he received a call from the same number, but this time the man on the phone had a strong accent and did not speak good English.  (Tr. 15-16).  TFO Harvey testified that he had heard the man with the strong accent in the background when he was speaking to the first man, and he got the impression that the second man dictated the meeting location.  (Tr. 16-18).

The meeting location in Mableton was a strip mall off Veteran's Memorial Highway.  (Tr. 8, 18).  After TFO Harvey parked his car, the men called, said they were right behind him, and asked TFO Harvey follow them to another location across the

3

street.  (Tr. 8).  TFO Harvey refused, and instructed the men to go get the merchandise and return.  (Tr. 8, 22-23).  They agreed.  (Tr. 8).  TFO Harvey observed that the men were riding in a Chevrolet Avalanche, which was about eight feet behind, perpendicular to, and just off to the side of his car.  (Tr. 8, 19-20).  TFO Harvey could see the passenger was Defendant, who was on the phone with him.  (Tr. 9-10, 19-20).  The other man, the driver, was looking around.  (Tr. 10).  After the men drove away, TFO Harvey left the strip mall and called them back 15-20 minutes later.  (Tr. 10).  Because the men had earlier disclosed that their tag was expired, TFO Harvey asked them to meet him at a Kmart about a mile away so they could be pulled over for the expired tag.  (Tr. 10-11, 20).

During the fifteen phone calls TFO Harvey had with the men in Atlanta, no one ever said the word "drugs."  (Tr. 22, 132).  TFO Harvey used the word "merchandise" during one of their conversations, but the men did not make any explicit references to drugs.  (Tr. 22).  TFO Harvey testified that, under the circumstances, he understood his conversation with Defendant used coded language for the purpose of carrying out a drug transaction.  (Tr. 23, 25).

DEA agents coordinated with the Georgia State Patrol (GSP) while planning the operation, and intended to have GSP officers conduct a traffic stop on the target subjects.  (Tr. 31-32).  During the operation, law enforcement officers from different departments communicated using DEA radio and the text messaging application WhatsApp.  (Tr. 124-25).  The GSP officers were not in the WhatsApp group

4

exchanging text messages, but were able to receive information over DEA radio.  (Tr. 31, 42-43, 131; Gov't Ex. 7).

TFO Cory Neighbors was at the strip mall conducting surveillance from his vehicle about 50 yards from TFO Harvey.  (Tr. 29, 33).  TFO Neighbors knew TFO Harvey had a conversation with the two individuals in the truck, but he did not know the substance of their conversation.   (Tr. 40).   TFO Neighbors was not receiving information directly from TFO Harvey; information was relayed to him from someone else on the radio.  (Tr. 39).  After TFO Harvey left the strip mall to relocate to Kmart, TFO Neigbors remained in the strip mall parking lot.  (Tr. 30, 36).  TFO Neighbors saw the black Chevrolet Avalanche return to the parking lot less than an hour later.  (Tr. 30, 35).  When the Avalanche departed, TFO Neighbors believed it contained heroin, so he alerted the GSP officers that it was "time to conduct enforcement" over the DEA radio. (Tr. 31-32).

Also supporting the operation were Corporal Michael Allen of the GSP, another trooper, and a Motor Carrier Compliance Division (MCCD) officer, who were parked behind a building close to where the deal was supposed to occur.  (Tr. 43-45).  Over the radio, Corporal Allen received a description of vehicle and the tag.  (Tr. 44).  Corporal Allen knew the tag was expired prior to the stop.  (Tr. 44).  After receiving the request to stop the truck over the radio, Corporal Allen directed MCCD Officer Brody Shiver to conduct the traffic stop.  (Tr. 44, 50-51, 68).  Corporal Allen testified that he could not remember whether the GSP needed independent probable cause to stop the truck

because he could not remember what the DEA communicated to GSP at the time.  (Tr. 47-48).  Officer Shiver and the Trooper Ian Moreman went to effectuate the traffic stop, and Corporal Allen showed up on the scene later to provide backup.  (Tr. 48).

Officer Shiver pulled over the Chevrolet Avalanche.  (Tr. 50).  At that point, the truck was turning left on Old Powder Springs Road.  (Tr. 70, 115; Def.'s Ex. 2).  The most direct way to travel from the strip mall to Kmart would have been to travel directly down Veteran's Memorial Parkway.  (Tr. 26-27).  Officer Shiver testified that three things permitted him to pull over the Chevrolet Avalanche: a cracked windshield, dark window tint, and an expired tag.  (Tr. 53, 112).  Officer Shiver's dash camera recorded the traffic stop.  (Tr. 51; Gov't Ex. 1).  Although the crack is not visible in a still image of the dash camera footage, Officer Shiver described it as a single crack that ran from the top to the bottom of the windshield with an intersecting piece that came off to the side.  (Tr. 77; Def's Ex. 2).  According to Officer Shiver, the window tint appeared to be darker than the legal limit of 32 percent.  (Tr. 53).  Officer Shiver did not check the tint of the window until after Defendant was in custody, and then discovered it was within the legal limits.  (Tr. 79, 113).  The temporary license plate on the Chevrolet Avalanche had expired on October 24, 2017, the day before the traffic stop.  (Tr. 60-61; Gov't Ex. 5).  Officer Shiver turned his lights on when the truck was perpendicular to him and he had not yet seen the license plate, but testified that he heard over DEA radio that the tag was expired.  (Tr. 69, 76, 113).

Defendant was driving the truck when Officer Shiver pulled it over.  (Tr. 54).

Defendant stated that the truck did not belong to him, but that Castro recently purchased it. (Tr. 72, 74). Defendant complied with all of Officer Shiver's requests, including his requests to provide identification and roll down the back window of the truck. (Tr. 71-72). When Defendant rolled the back window down, Officer Shiver noticed a box of Frosted Flakes on the floorboard. (Tr. 55). Officer Shiver testified that after getting his warrant pad and returning to the truck, the box was moved underneath the back seat. (Tr. 55). But the dash camera footage shows that Defendant exited the truck during his initial conversation with Officer Shiver and never reentered the truck. (Tr. 81). As a result, Defendant could not have moved the box. (Tr. 81, 107).

Officer Shiver wrote in his report that Defendant was trembling and unwilling to make eye contact. (Tr. 83, 116; Def's Ex. 4 at 2). Officer Shiver stated that he observed this behavior when Defendant was trying to get his identification, but acknowledged that Defendant followed all of his commands without hesitation. (Tr. 82-86). On cross-examination, when presented with video from his dash camera, Officer Shiver admitted that Defendant did look directly at him when Officer Shiver approached the truck. (Tr. 122). By the time Defendant exited the vehicle about a minute and a half into the stop, he seemed friendly and talkative and showed no signs of trembling. (Tr. 80, 84). At one point, Officer Shiver testified that his report of "trembling" referred to Defendant's inability to keep his hands still when he was talking to Officer Shiver outside the car, but then reverted back to claiming it referenced Defendant trembling when Officer Shiver requested identification. (Tr. 85-86).

7

Almost two minutes into the traffic stop, Officer Shiver informed Defendant he was just going to issue him a warning. (Tr. 88). Around that time, Trooper Moreman arrived and began questioning Castro. (Tr. 87-88, 148). Defendant initiated a conversation with Officer Shiver about the engine in Officer Shiver's car. (Gov't Ex. 1 at 1:53, 2:40). With a warning pad and Defendant's license in his hand, Officer Shiver asked Defendant questions about where he lives and what language he can read. (Tr. 88). Around three minutes into the stop, Officer Shiver reiterated that he would give Defendant a warning. (Tr. 88). Officer Shiver then asked Defendant another series of questions about Castro, who owns the car, where they were traveling to and from, and how to pronounce his middle name. (Tr. 89-90). Officer Shiver asked Trooper Moreman if he had been able to identify Castro, and Trooper Moreman responded that he was working it. (Tr. 90). Castro had given Trooper Moreman a false name. (Tr. 56). Officer Shiver then asked additional questions of Defendant about his presence in Georgia, his marriage, whether Castro has a passport, whether Castro is here illegally, and where Castro lives. (Tr. 90-91).

About five minutes and forty-five seconds into the stop, Officer Shiver instructed Defendant to wait while he runs his license. (Tr. 94; Gov't Ex. 1 at 5:42). Approximately eight minutes into the stop, Officer Shiver called Defendant over to the passenger window of his car and asked him more questions about Castro. (Tr. 95). Officer Shiver then asked if Defendant had ever been arrested, and Defendant told Officer Shiver that he was arrested the previous day for trying to purchase marijuana,

which Officer Shiver testified and wrote in his report made him suspect that drugs were in the truck. (Tr. 55-56, 120). Defendant denied having marijuana in the truck. (Gov't Ex. 1 at 8:49). Officer Shiver then printed out a consent to search form. (Tr. 98). After asking Defendant a few more questions about Castro, Officer Shiver asked Defendant for his consent to search the truck about thirteen minutes into the stop. (Tr. 56-57, 98-99; Gov't Ex. 1 at 12:47). Defendant turned to communicate with Castro in Spanish and again stated that Castro let him drive his truck. (Tr. 100). When asked again for consent to search the truck and all of its contents, Defendant responded, "I guess so." (Tr. 100-101; Gov't Ex. 1 at 13:21). Officer Shiver gave Defendant a consent form to read, asked him to sign the form if he granted permission, say no if he did not grant permission, and backed away. (Tr. 56, 101; Gov't Ex. 1 at 13:25-13:35; Gov't Ex. 2). Around thirty seconds later, Defendant approached Officer Shiver, said that he had a question, and stated that he did not get arrested with marijuana on him. (Tr. 101-102; Gov't Ex. 1 at 14:05). Officer Shiver responded that Defendant said he was going to buy weed, and Defendant replied that he did not touch anything. (Tr. 102). Officer Shiver then told Defendant that the question is whether he can search the vehicle and all of its contents. (Tr. 102). Defendant responded, "that was just my question," and then said "yeah." (Tr. 103, 118; Gov't Ex. 1 at 14:20). Officer Shiver then said, "sign that for me," and Defendant signed the form granting permission to search the truck. (Tr. 103; Gov't Ex. 2).

Officer Shiver instructed Defendant and Castro not to speak to one another, patted

9

down Defendant's pockets, and then reached inside and retrieved two cell phones.  (Tr. 104-105).  Officer Shiver testified that he removed the cell phones from Defendant's pocket to ensure that he would not communicate with anyone else, potentially calling someone to come "shoot or fight" the officers.  (Tr. 117).  Officer Shiver also removed two cell phones he found in the console of the truck.  (Tr. 58; Gov't Ex. 6).  During the search, Officer Shiver noticed the Frosted Flakes box had been moved under the seat.  (Tr. 106-107).  Officer Shiver found what he suspected to be heroin in seven packages inside the Frosted Flakes box.  (Tr. 59).  After the discovery of the suspected heroin, Defendant's demeanor changed – he appeared shocked and insisted it did not belong to him.  (Tr. 108-109).  Seventeen minutes and twenty seconds into the stop, Defendant and Castro are handcuffed.  (Tr. 59, 109-110).  Officer Shiver gave Defendant a citation for heroin trafficking and a courtesy warning for expired tags and window tint.  (Tr. 110-111; Def's Exs. 5, 6).  The courtesy warning was given at 6:40 P.M., although Officer Shiver had his warning pad out two minutes after the stop was initiated at 6:10 P.M.  (Tr. 111).  In all, Officer Shiver asked Defendant around 35-40 questions during the traffic stop.  (Tr. 119).  After Defendants were arrested, TFO Clutter, the lead case agent, took custody of the four phones that were seized from Defendant and Castro.  (Tr. 126-127).  TFO Clutter, the lead case agent, then applied for and obtained a search warrant for the phones on November 2, 2017.  (Tr. 124, 127).

## LEGAL ANALYSIS

### I.   SEARCH AND SEIZURE OF THE TRUCK

Defendant argues Officer Shiver did not have probable cause or reasonable suspicion of criminal activity when he stopped and searched the Avalanche. (Def.'s Br. Doc 68, at 15-22). Defendant focuses much of his argument on whether Officer Shiver had reasonable suspicion to believe Defendant committed a traffic offense justifying the stop. (Id.). According to Defendant, the limitation on window tint found in O.C.G.A. § 40-8-73.1 only applies to the front windshield and front passenger windows. (Id. at 16-19). Officer Shiver asserts that he stopped the truck in part for its tinted back windows, and Defendant contends that Officer Shiver's belief that the law applied to those back windows was unreasonable in light of his professed familiarity with the statute. (Id. at 19). Defendant argues that there is no evidence of the cracked window other than the testimony of Officer Shiver. (Id. at 19-20; Def.'s Ex. 2). In addition, O.C.G.A. § 40-8-73 only bans driving with cracked windows "having a starburst or spider webbing effect greater than three inches by three inches." (Id. at 20). Finally, Defendant points out that Officer Shiver did not see the expired tag before he initiated the stop. (Id. at 20-21). Although Officer Shiver testified that he heard about the expired tag over the DEA radio, Defendant contends that Officer Shiver is not a credible witness given the discrepancies between his report, his testimony, and the dash camera videos. (Id. at 21-22). Defendant also argues Officer Shiver improperly extended the duration of the stop. (Id. at 23-28). Lastly, Defendant contends that his consent to

11

search the truck was not voluntary.  (Id. at 28-32).

In response, the Government asserts that the DEA agents had probable cause to stop and search the truck, and their knowledge is imputed to the GSP officers under the collective knowledge doctrine.  (Gov't Resp., Doc. 74, at 5-9).  As a result, the automobile exception permitted the GSP officers to stop and search of the truck.  (Id. at 9).  Further, the Government contends that Officer Shiver also had reasonable suspicion to stop the truck based on the window tint, cracked window, and expired tag.  (Id. at 10).  The Government disagrees with Defendant's interpretation of O.C.G.A. § 40-8-73.1, arguing that it does regulate the tint on the back windows.  (Id. at 10-11).  Although admitting that Officer Shiver likely began the stop before seeing the expired tag, the Government relies on Officer Shiver's testimony that he heard the tag was expired over DEA radio before making the stop and points to Officer Shiver's testimony that there was a large crack in the truck's windshield.  (Id. at 12).  The Government also contends that the stop was not excessive in duration, and Defendant voluntarily consented to the search of the truck.  (Id. at 13-16).

Defendant replies that the collective knowledge doctrine did not apply and the Government cannot impute the knowledge of the DEA agents to Officer Shiver.  (Def.'s Reply, Doc. 77, at 1-6).  Further, Defendant argues neither the DEA agents, Corporal Allen, nor Officer Shiver had probable cause to stop the truck based on their observations or information communicated to them.  (Id. at 4-5).  Corporal Allen directed Officer Shiver to stop the truck, and neither of them had access to the text

messages exchanged between the DEA agents.  (<u>Id.</u> at 4-6).  In addition, the truck was not taking the direct route to Kmart when it was stopped, and none of the communications or testimony suggest that any of the officers saw drugs being placed into the truck.  (<u>Id.</u> at 5-6).  Because the undersigned finds that the stop and search of the truck was supported by probable cause, or at least reasonable suspicion, Defendant's motion is due to be denied.

**A.**     **<u>Probable Cause or Reasonable Suspicion Justified the Search and Seizure of the Truck</u>**

**1.     The Collective Knowledge Doctrine Applies to the Search and Seizure**

Officer Shiver need not rely solely on his observations to justify the traffic stop and search of the truck, but may draw upon the collective knowledge of the officers working on the operation.  For the collective knowledge doctrine to apply, the officers must have maintained "at least a minimal level of communication during their investigation." <u>United States v. Willis</u>, 759 F.2d 1486, 1494 (11th Cir. 1985).  Where there is minimal communication between different officers, the Court evaluates not just the knowledge of the investigating officer, but whether the collective knowledge of all of the officers involved amounts to reasonable suspicion or probable cause.  <u>United States v. Williams</u>, 199 F. App'x 828, 831 (11th Cir. 2006); <u>United States v. Allison</u>, 953 F.2d 1346, 1350 (11th Cir. 1992); <u>Willis</u>, 759 F.2d at 1494; <u>United States v. Kapperman</u>, 764 F.2d 786, 791 n.5 (11th Cir. 1985); <u>United States v. Astling</u>, 733 F.2d 1446, 1460 (11th Cir. 1984).

AO 72A
(Rev.8/82)

Here, the DEA coordinated with the GSP prior to the operation, communicated with the GSP during the operation, and directed the GSP to stop the Avalanche. (Tr. 31). Officer Shiver knew in advance that his role was to pull over a vehicle following a drug transaction orchestrated by the DEA. (Tr. 50). Along with Corporal Allen and another officer, Officer Shiver waited behind a building on Veteran's Memorial Parkway "for the target to move." (Tr. 45-46, 51). After the Avalanche departed the parking lot, TFO Neighbors asked the GSP to stop the truck over DEA radio. (Tr. 31-32). At the point he requested the stop, TFO Neighbors believed the vehicle contained heroin. (Tr. 32). Corporal Allen then directed Officer Shiver make the stop. (Tr. 31, 51).

Defendant contends that the collective knowledge doctrine does not apply because the information the DEA possessed was not communicated to Officer Shiver or Corporal Allen. (Doc. 77, at 4-5). During the operation, the law enforcement officers communicated information and coordinated their movements using DEA radio and WhatsApp text messages. (Tr. 124-125; Gov't Ex. 7). Defendant points out that only the DEA task force officers were in the WhatsApp group, where text messages communicated that the target wanted the undercover officer to follow them to an apartment to "get the stuff," the truck had an expired plate and a window tint violation, and the target agreed to meet the undercover officer at Kmart. (Doc. 77, at 6; Gov't Ex. 7, at 2). However, the officers with knowledge that gives rise to probable cause or reasonable suspicion do not have to communicate that knowledge to the acting officer;

14

only minimal communication is required to trigger the collective knowledge doctrine. Kapperman, 764 F.2d at 791 n.5 (holding that although the arresting officer may not have known all facts uncovered in the investigation, the officer was entitled to act on a radio communication directing him to stop the vehicle); United States v. Olmedo, 552 F. Supp. 2d 1347, 1353, 1356-57 (S.D. Fla. 2008) (holding that the court should evaluate the officers' collective probable cause even though the officers with knowledge of drug transaction did not share any details with the officer they directed to make traffic stop and arrest).   The communication requirement serves to distinguish officers functioning as a team from officers acting as independently who are coincidentally investigating the same subject.   United States v. Terry, 400 F.3d 575, 581 (8th Cir. 2005) (applying the Eighth Circuit's "some degree of communication test"). "[E]ffective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information." United States v. Hensley, 469 U.S. 221, 231 (1985) (quoting United States v. Robinson, 536 F.2d 1298, 1300 (9th Cir. 1976)). The communication requirement is satisfied where law enforcement officers are functioning as a team and one officer asks another to take some action.   See United States v. Ramirez, 473 F.3d 1026, 1033-37 (9th Cir. 2007) (summarizing Circuit decisions approving the use of the collective knowledge doctrine where the investigating officer simply provided a description of the suspect to the officer

15

conducting the stop, search, or arrest), cert. denied, Ramirez v. United States, 552 U.S. 866 (2007) and Beltran v. United States, 522 U.S. 1011 (2007); United States v. Cotton, 721 F.2d 350, 351-52 (11th Cir. 1983) (approving a traffic stop where the officer with reasonable suspicion called on his radio for another officer to stop the car).

Further, Corporal Allen did not need to have all the facts supporting probable cause or reasonable suspicion to direct Officer Shiver to stop the truck. Corporal Allen's presumed role as an intermediary between the DEA and Officer Shiver during the operation did not render the collective knowledge doctrine inapplicable. See United States v. Ibarra-Sanchez, 199 F.3d 753, 758-59 (5th Cir. 1999) (finding the collective knowledge doctrine applicable when a DEA agent with reasonable suspicion called a dispatcher to request a traffic stop, and officers responded to the dispatcher's bulletin). In United States v. Hernandez, 17 F. Supp.3d 1255, 1259-60 (N.D. Ga. 2014), a court in the Northern District of Georgia applied the collective knowledge doctrine where the officer knew that his department had been asked to assist federal investigators, but was not aware of any of the details or the outline of the investigation. Id. at 1259-60. The investigator who had reasonable suspicion communicated with the officer's partner, who was in a separate car, but not the officer directly. Id. at 1260-61. Similarly, Officer Shiver had at least basic information about the operation and his role in it, and Corporal Allen directed him to stop the truck based on communications he received from the DEA. (Tr. 44, 50-51). Corporal Allen knew the target, the truck's description, location, the fact that it had an expired tag, and when the stop should be conducted. (Tr. 44).

16

Officer Shiver arguably had more information than the officer in Hernandez because he knew the operation involved a drug transaction and the truck he was tasked with stopping had an expired tag.  (Tr. 50-51, 113).

Officer Shiver was entitled to act on the strength of the radio communication directing him to stop the vehicle.  Kapperman, F.2d at 791 n.5 (finding the collective knowledge doctrine applied where officer received a radio directive to "stop the vehicle and secure the scene"); Cotton, 721 F.2d at 351-52; United States v. Rodriguez-Alejandro, 664 F. Supp.2d 1320, 1335-36, 1339-40 (N.D. Ga. 2009) (applying the collective knowledge doctrine where the officer conducting the traffic stop was alerted that the vehicle was suspected of carrying drugs).  The case at hand bears many similarities to United States v. Agarwal. 2018 WL 3061923 (N.D. Ga. Apr. 6, 2018), adopted by 2018 WL 2181620 (N.D. Ga. May 11, 2018).  In Agarwal, the trooper who stopped a car was briefed in advance that a confidential source was going to set up a transaction to purchase synthetic marijuana.  Id. at *10.  The trooper's role was to wait in the general area, and once alerted that the suspect was driving, to conduct a traffic stop.  Id.  On the day of the transaction, the trooper was in communication with the DEA by radio or cell phone.  Id.  After the DEA agent saw boxes he suspected contained synthetic marijuana in the car, the DEA agent communicated over the radio the car the suspect was driving, the timing and location of the transaction, and the movement of the vehicle.  Id.  These communications were sufficient to trigger the application of the collective knowledge doctrine.  Id.  The radio communications in Agarwal are markedly

AO 72A
(Rev.8/82)

similar to the communications involved in this case.  The GSP officers knew they were part of a DEA operation to intercept a drug transaction and their role would be to stop the vehicle involved.  (Tr. 31, 42, 43, 50).  The DEA did not communicate all of the factual developments, but only what was necessary for the GSP officers to carry out their anticipated role: the location of the operation, the description of the truck, the timing of when to make the stop, and the expired tag.  (Tr. 31, 42-44, 113).

Because Officer Shiver and Corporal Allen had minimal communications with the DEA agents, the collective knowledge of the DEA agents and the GSP officers is considered in determining whether there was reasonable suspicion or probable cause for the traffic stop and search of the truck.  See United States v. Marsh, 663 F. App'x 888, 893 (11th Cir. 2016) (although the officer conducting the stop did not have all the knowledge forming the basis of probable cause, he did have minimal communication with DEA agents through DEA radio); United States v. Mejia-Chicas, 287 F. App'x 830, 831-32 (11th Cir. 2008) (concluding that the collective knowledge of state trooper and ICE agents provided reasonable suspicion to continue the traffic stop); Ibarra-Sanchez, 199 F.3d at 756-57 (imputing the DEA agents' knowledge to local police even though the local police were only responding to a bulletin sent out by a dispatcher); United States v. Rodriguez, 831 F.2d 162, 164 (7th Cir. 1987) (applying the collective knowledge doctrine where DEA agents with reasonable and articulable suspicion to stop the vehicle asked a state trooper to conduct a "routine traffic stop" for them); United States v. Crump, No. 4:10-CR-032-HLM-WEJ, 2011 WL 6153106, at *4-5 (N.D. Ga.

18

Nov. 21, 2011), <u>adopted</u> <u>by</u> 2011 WL 6179211 (N.D. Ga. Dec. 12, 2011) (considering the collective knowledge of DEA agents and local law enforcement officers when determining the existence of reasonable suspicion).

### 2.   Probable Cause Supported the Traffic Stop and Subsequent Search of the Truck

A traffic stop is a seizure that implicates the Fourth Amendment.  <u>Brendlin v. California</u>, 551 U.S. 249, 255-259 (2007) (citing <u>Delaware v. Prouse</u>, 440 U.S. 648, 653 (1979).  In this case, the warrantless stop and search of the truck was justified because Officer Shiver had probable cause to believe that the truck was violating a traffic law and probable cause to believe that the truck contained evidence of an illegal drug transaction.  Law enforcement officers have probable cause to arrest when the facts and circumstances within their collective knowledge, "or of which they have reasonably trustworthy information, would cause a prudent person to believe that the suspect has committed or is committing an offense." <u>Craig v. Singletary</u>, 127 F.3d 1030, 1042 (11th Cir. 1997).  "[S]ufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment," and "probable cause itself is a doctrine of reasonable probability and not certainty," <u>Craig</u>, 127 F.3d at 1042 (quoting <u>Hill v. California</u>, 401 U.S. 797, 804 (1971) and <u>United States v. Magluta</u>, 44 F.3d 1530, 1535 (11th Cir. 1995)); <u>Ortega v. Christian</u>, 85 F.3d 1521, 1524 (11th Cir. 1996) ("Probable cause does not require overwhelmingly convincing evidence, but only 'reasonably trustworthy information'").  Probable cause "must be judged not with clinical detachment, but with

a common sense view to the realities of normal life." <u>Craig</u>, 127 F.3d at 1042.  An officer only needs reasonable suspicion to stop and briefly detain a car to investigate suspicion of criminal activity.  <u>Terry v. Ohio</u>, 392 U.S. 1, 21-22 (1968); <u>United States v. Spoerke</u>, 568 F.3d 1236, 1248 (11th Cir. 2009); <u>United States v. Tapia</u>, 912 F.2d 1367, 1370 (11th Cir. 1990); <u>see also</u> <u>United States v. Glinton</u>, 347 F. App'x 453, 454 (11th Cir. 2009).  The facts in this case, however, support probable cause because the facts and circumstances within the officers' collective knowledge "would cause a prudent person to believe that the suspect has committed or is committing an offense." <u>Craig v. Singletary</u>, 127 F.3d 1030, 1042 (11th Cir. 1997).

Officer Shiver had probable cause to stop the car based on information within the collective knowledge of the officers working on the operation.  DEA officers informed the GSP officers over the radio that the Chevrolet Avalanche had an expired tag before Officer Shiver initiated the traffic stop.  (Tr. 44, 113).  The expired tag alone provided probable cause for Officer Shiver to stop the truck.[1]  <u>Whren v. United States</u>, 517 U.S. 806, 810-11 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."); <u>Draper v. Reynolds</u>, 369 F.3d 1270, 1275 (11th Cir. 2004) "[U]lterior motives will not invalidate police conduct based on probable cause to believe a violation

---

[1] In addition, Officer Shiver believed the truck's windows were darker than the legal limit.  (Tr. 53).  Even though his suspicion turned out to be incorrect, his reasonable interpretation of O.C.G.A. § 44-8-73.1 and mistake of fact would not render the stop unreasonable.  <u>Hein v. North Carolina</u>, 135 S. Ct. 530, 539-40 (2014).

of the law occurred."), <u>cert. denied</u>, 543 U.S. 988 (2004).

In addition, information within the collective knowledge of the officers gave rise to probable cause that the suspects in the truck were selling heroin.  TFO Harvey, working undercover, called a number in Mexico to arrange an already negotiated heroin transaction.  (Tr. 4-5).  TFO Harvey arranged to purchase "four lunch" because he knew the deal was structured to buy four kilograms of heroin for $52,000 each.  (Tr. 5).  The Mexican source then gave TFO Harvey a number with an Atlanta area code and told him to expect a call.  (Tr. 5).  TFO Harvey received a call from that number and arranged to meet at a strip mall on Mableton Parkway.  (Tr. 6-8).  At the strip mall, the same number called and asked him to follow their truck, which was parked perpendicular to TFO Harvey's car.  (Tr. 8-9).  TFO Harvey could see he was speaking on the phone with the passenger in the Chevrolet Avalanche, who he identified as Defendant.  (Tr. 9-10).  The passenger informed TFO Harvey the merchandise was not with them, and instructed Officer Harvey to follow the truck across the street.  (Tr. 8, 10).  Neither man in the truck ever used the word "merchandise;' the word was used by TFO Harvey.  (Tr. 22-23, 26).  TFO Harvey testified that in his experience such coded language is regularly used when arranging drug transactions.  (Tr. 25, 26).  TFO Harvey refused to follow the truck, and asked them to go get it and come back and meet him.  (Tr. 8, 25).  The men in the truck agreed.  (Tr. 8).  The men also told TFO Harvey that they were hesitant to drive the car because it had an expired tag.  (Tr. 10-11).  TFO Harvey saw them drive across the street before he pulled away.  (Tr. 10).  TFO Neighbors, who was conducting

21

surveillance in the strip mall parking lot, saw the truck pull away and then return less than an hour later.  (Tr. 30-31, 35).  Based on the prearranged drug transaction, the communications between TFO Harvey and the truck's occupants, and the truck's movements, the officers had probable cause to believe the truck left, retrieved the heroin, and was en route to meet TFO Harvey at Kmart.  (Tr. 31-32).

Where probable cause exists along with exigent circumstances, officers may conduct a warrantless search.  Chambers v. Maroney, 399 U.S. 42, 51 (1970).  Under the automobile exception, officers may conduct a warrantless search of a vehicle if the vehicle is readily mobile and there is a fair probability that contraband or evidence of a crime will be found in the vehicle.  Carroll v. United States, 267 U.S. 132, 149, 155-56 (1925); United States v. Carter, 481 F. App'x 475, 477 (11th Cir. 2012); United States v. Watts, 329 F.3d 1282, 1286 (11th Cir. 2003).  The first prong, vehicle mobility, is easily met because the truck was being driven at the time it was stopped.  United States v. Marsh, 663 F. App'x 888, 892 (11th Cir. 2016).  As for the second prong, the collective knowledge of the officers involved in the operation – the prearranged drug transaction, the communications between TFO Harvey and the truck's occupants, and the truck's movements – gave rise to probable cause that evidence of a crime would be found inside the truck.  See United States v. Willix, 723 F. App'x 908, 911 (11th Cir. 2018) (officers knew package contained illicit drugs, defendant showed up to collect package, and defendant evaded apprehension); United States v. Olvera, 178 F. App'x 373, 374-75 (5th Cir. 2006) (officers intercepted a phone call arranging a shipment of

22

"60" while wiretapping a known cocaine distributor; defendant then traveled from one of distributor's properties to a hotel, got into a Honda Accord, and three Accords left the hotel at the same time for the interstate); United States v. Jackson, 548 F. Supp.2d 1314, 1321 (M.D. Fla. 2008) (wiretap of suspected supplier identified a vehicle in the vicinity suspected of transporting drugs and then same vehicle was seen again when surveillance revealed the supplier had returned to the area).

Officers can develop probable cause based on coded communications arranging a drug transaction and a vehicle's movement, even if the drug transaction is not directly observed. In United States v. Harris, agents monitoring a wiretap heard a caller arrange to buy "10" from a suspected drug dealer. 603 F. App'x 858, 859 (11th Cir. 2015). The caller's number, which had a 239 area code, was known to officers because it exchanged numerous calls the dealer. Id. The next day, the dealer received a call from the 239 number asking for directions from a McDonalds. Id. At the time the call was made, officers saw a green Saturn sedan at the McDonalds. Id. The green Saturn was later seen at the dealer's house along with the dealer's car and the supplier's car. Id. at 859-60. When an officer stopped the car due to a non-functioning light, he noticed that the driver's license indicated the driver was from Fort Myers, which has a 239 area code. Id. at 860. The Eleventh Circuit found those facts were sufficient to cause a reasonably prudent person to believe that the driver of the Saturn just purchased cocaine. Id. at 861. Similarly, in the case at hand, officers had probable cause to believe the Chevrolet Avalanche contained heroin after setting up the heroin purchase, communicating with

23

the truck's occupants on a number provided by the contact in Mexico, seeing them pull up in the truck while on the phone with TFO Harvey, and obtaining their agreement that they would go pick up the merchandise and then meet TFO Harvey.  The collective knowledge of the officers gave rise to probable cause that the truck contained heroin; as a result, Officer Shiver was permitted to stop and search the truck under the automobile exception.  See Olvera, 178 F. App'x at 375 (finding that probable cause to believe suspect was transporting cocaine justified a warrantless stop and search).

> 3.   **In the Alternative, the Duration of the Stop and Subsequent Search of the Truck Were Justified by Reasonable Suspicion and Consent.**

Even if the conduct and communications observed by the officers did not give rise to probable cause, reasonable suspicion would support the search and seizure.  In Terry v. Ohio, the Supreme Court announced a two-part inquiry to determine the reasonableness of an investigative stop: first, whether the stop was justified by reasonable suspicion that the defendant had engaged or was about to engage in criminal activity; second, whether the stop was "reasonably related in scope to the circumstances which justified the interference in the first place." 392 U.S. at 20.  Reasonable suspicion should be determined based on the collective knowledge of all the officers involved in the stop.  United States v. Cotton, 721 F.2d 350, 352 (11th Cir. 1983).  "When making a determination of reasonable suspicion, we must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing.  It is clear that an inchoate and

24

unparticularized suspicion or hunch of criminal activity is not enough to satisfy the minimum level of objectivity required." United States v. Perkins, 348 F.3d 965, 970 (11th Cir. 2003) (internal citations and quotations omitted).

Certainly, the officers reasonably suspected that the occupants of the truck intended to sell heroin to the undercover officer, and the heroin was located in the truck at the time of the traffic stop. United States v. Acosta, 363 F.3d 1141 (11th Cir. 2004), is instructive. In Acosta, the defendant's car arrived at the meeting place at the designated time to exchange money with an undercover agent, and the defendant was seen talking on his phone at the same time the undercover officer was on the phone with the suspect. Id. at 1142. After the undercover officer said the exchange was postponed, the defendant drove away and removed a gym bag from his car, and officers later saw the defendant pick up the gym bag and prepare to depart at the time of the rescheduled money exchange. Id. at 1142-43. The Eleventh Circuit found that the officers in Acosta had "more than enough objectively reasonable suspicion that [defendant] was involved in criminal activity." Id. at 1145. Similarly, in this case, the officers involved had at least reasonable suspicion that the truck contained heroin, as well as probable cause to believe the truck was violating traffic laws. See United States v. Packer, 375 F. App'x 976, 977–78 (11th Cir. 2010) ("A decision to stop a vehicle is reasonable under the Fourth Amendment when an officer has either probable cause or reasonable suspicion to believe that a traffic violation occurred."). As a result, the reasonableness of the stop hinges on whether the scope of the stop was reasonable.

25

In determining whether the scope of a <u>Terry</u> stop was reasonable, there are no "rigid time limitations" or "bright line rules;" courts must look to "common sense and ordinary human experience." <u>Acosta</u>, 363 F.3d at 1147 (quoting <u>United States v. Sharpe</u>, 470 U.S. 675 (1985)). The Eleventh Circuit has identified several non-exclusive factors relevant to the analysis: "the law enforcement purpose served by the detention, the diligence with which the police pursue the investigation, the scope and intrusiveness of the detention, and the duration of the detention." <u>United States v. Hardy</u>, 855 F.2d 753, 759 (11th Cir. 1988).

In reviewing the first factor, the law enforcement purposes served by the detention, the most important consideration is whether the officers pursued a method of investigation likely to dispel or confirm their suspicions quickly and with minimum interference. <u>Acosta</u>, 363 F.3d at 1146. A <u>Terry</u> stop may be used to engage in brief and nonintrusive investigation techniques like noncustodial questioning. <u>Hardy</u>, 855 F.2d at 759. Officer Shiver engaged in noncustodial questioning when he asked Defendant questions about Defendant's presence in Georgia, the owner of the car, Castro's identity, and whether Defendant would consent to a search of the truck. Officer Shiver's questions were conversational and reasonably related to his underlying suspicion that the truck's occupants were selling cocaine. Where such reasonable suspicion exists, an officer is not restricted to asking questions related to the traffic violations during a <u>Terry</u> stop. <u>United States v. Hernandez</u>, 418 F.3d 1206, 1209 n.3 (11th Cir. 2005) (finding the continued detention of occupants for 17 minutes to be

reasonable where the officer pulled over the car for speeding, became suspicious after the driver gave an implausible excuse for speeding, and continued to ask additional investigative questions unrelated to the speeding violation).  The officers' reasonable suspicion that the truck contained cocaine justified extending the stop and questioning Defendant on topics beyond the perceived traffic violations.  See United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001) ("The traffic stop may not last 'any longer than necessary to process the traffic violation' unless there is articulable suspicion of other illegal activity.").  In United States v. Simms, 385 F.3d 1347 (11th Cir. 2004), an officer pursuing a car for following too closely heard over the radio that the car was suspected of transporting drugs.  Id. at 1350, 1354-55.  After being pulled over, the driver appeared nervous, claimed to be traveling to a hospital in another state, and had a prior drug-related arrest.  Id. at 1354.  The Eleventh Circuit held the officer had "more than sufficient information upon which to base a reasonable suspicion" to prolong the traffic stop, and may have even had probable cause to search the car.  Id. at 1354-55.  Similarly, Officer Shiver had more than sufficient information to justify prolonging the stop to ask additional questions: he knew the DEA believed the truck contained illegal drugs, Castro gave a false name to Trooper Moreman, and Defendant admitted to being arrested for trying to buy marijuana the previous day.

Turning to the second factor, there is no indication in the record that Officer Shiver and Trooper Moreman unnecessarily delayed the stop.  Defendant objects to Officer Shiver informing Defendant of his intention to issue a warning within the first

two minutes, but then continuing to detain Defendant and ask questions unrelated to the traffic stop.  (Doc. 68, at 26).  After informing Defendant he would issue a warning for the traffic violations, Officer Shiver was still permitted to run Defendant's license and ask questions to investigate his reasonable suspicion that the truck's occupants were attempting to sell drugs without converting the Terry stop into an arrest.  See Purcell, 236 F.3d at 1278 (noting that officers may prolong a detention to investigate driver's license, registration, and request a computer check);  United States v. Pruitt, 174 F.3d 1215, 1219 (11th Cir. 1999) (holding that an officer conducting a legitimate traffic stop may request a driver's license and run a computer check); Simms, 385 F.3d 1354-55 (holding that an officer with reasonable suspicion that other illegal activity is being committed may extend the Terry stop and ask additional questions).

The third factor is whether the scope and intrusiveness of the detention exceeded what was needed to ensure officer safety.  Here, Officer Shiver stopped the truck and then asked Defendant to step out of the truck and stand in front of his car.  (Tr. 72, 97). Standing in front of Officer Shiver's car is a minimal restriction on Defendant's movement and does not transform the Terry stop into an arrest.  Maryland v. Wilson, 519 U.S. 408, 412 (1997) (recognizing the rule that it is *per se* reasonable for an officer to order a driver to get out of a vehicle during a traffic stop).  Defendant was stopped on a public road with other people in the vicinity, no weapons were drawn, and the officers did not use physical force.  The manner in which Defendant was detained did not convert the Terry stop into an arrest.  See Acosta, 363 F.3d at 1147, 1150 (finding

restraints were "the minimum necessary" to effectuate a stop where a defendant suspected of money laundering was stopped in a public place, an officer initially drew his weapon but holstered it quickly, the defendant was not handcuffed, the defendant remained standing the entire time, and no force was used against him).

As to the fourth factor, Defendant was not detained for an unreasonable amount of time given the purpose of the stop.   After the initiation of the traffic stop, approximately fourteen and a half minutes passed before Defendant granted consent to search the vehicle, and around seventeen and a half minutes passed before Defendant and Castro were placed in handcuffs. (Gov't Ex. 1 at 14:20 and 17:20).  Although there is no bright line rule, the duration of the stop in this case is well within the bounds of what the Eleventh Circuit has approved. See United States v. Heath, 622 F. App'x 843, 846 (11th Cir. 2018) (approving a 30-minute stop); Hernandez, 418 F.3d at 1211 (approving a 17-minute stop); Acosta, 363 F.3d at 1148 (approving a 30-minute stop); Purcell, 236 F.3d at 1277 (finding that a 14-minute period between the initiation of the stop and consent to search was "certainly not unreasonable" on its face); Hardy, 855 F.2d at 761 (approving a 50-minute stop).  Taking into consideration all the factors discussed above, the Court finds that the scope of the stop was reasonable.

Where reasonable suspicion justified the scope of the stop, the subsequent search was appropriate given Defendant's voluntary consent.  A law enforcement officer may conduct a warrantless search based upon an individual's voluntary consent. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  Consent cannot be a function

of acquiescence to authority, but must be freely and voluntarily given.  Id. at 221-27; Bates v. Harvey, 518 F.3d 1233, 1244 (11th Cir. 2008); Purcell, 236 F.3d at 1281.  The Supreme Court set forth a number of factors to consider in determining whether consent was voluntary: the person's age, education, and intelligence; the existence of advice as to the nature of the constitutional right implicated; the length of detention preceding the request to consent, the nature of prior questioning; the environment; and whether any physical punishment was involved.  Schneckloth, 412 U.S. at 226; United States v. Zapata, 180 F.3d 1237, 1241 (11th Cir. 1999).  A list of relevant factors provided by the Eleventh Circuit is substantially similar: voluntariness of custodial status, coercive police procedures, extent of defendant's cooperation, defendant's awareness of the right to refuse consent, defendant's education and intelligence, and defendant's belief that no incriminating evidence will be found.  United States v. Chemaly, 741 F.2d 1346, 1352 (11th Cir. 1984).  None of these factors alone is dispositive; the voluntary nature of the consent is to be determined by evaluating the totality of the circumstances.  Schneckloth, 412 U.S. at 226-27; Johnston v. Tampa Sports Auth., 530 F.3d 1320, 1326 (11th Cir. 2008).   And the government bears the burden of proving the voluntariness of the consent.  Bumper v. North Carolina, 291 U.S. 543, 548 (1968).

Here, Officer Shiver requested Defendant's consent to search the truck about thirteen minutes into the stop.  (Tr. 56-57, 98-99; Gov't Ex. 1 at 12:47).  Officer Shiver prefaced his request by recounting that Defendant said he was arrested for marijuana yesterday and asking whether there was any marijuana in the truck.  (Gov't Ex. 1 at

30

12:40-12:46).  After briefly conversing with Castro, Defendant explained that Castro gave him permission to drive the truck.  (Gov't Ex. 1 at 13:10).  When Officer Shiver asked again for consent to search the truck, Defendant responded, "I guess so."  (Tr. 101; Gov't Ex. 1 at 13:21).  Officer Shiver gave Defendant the form to read in English, asked him to sign it if he granted permission, asked him to say no if he did not grant permission, and backed away.  (Tr. 56, 101; Gov't Ex. 1 at 13:25-13:35).  Defendant then stood alone with his head down, appearing to read the form.  (Gov't Ex. 1 at 13:35-14:05).  Around thirty seconds later, Defendant approached Officer Shiver, said that he had a question, and stated that he did not get arrested with marijuana on him.  (Tr. 101-102; Gov't Ex. 1 at 14:05-14:10).  Officer Shiver responded that Defendant said he was going to buy some weed, and Defendant stated that he did not touch anything.  (Tr. 102; Gov't Ex. 1 at 14:10-14:15).  Officer Shiver then told Defendant, "that's not the question; the question is can I search your vehicle and all of its contents."  (Tr. 102; Gov't Ex. 1 at 14:15).  Defendant responded, "that was just my question," and then said, "yeah."  (Tr. 103, 118; Gov't Ex.1 at 14:20).  Officer Shiver then said, "sign that for me," and Defendant signed the form consenting to the search of the truck.  (Tr. 103; Gov't Ex. 1 at 13:22-14:32; Gov't Ex. 2).  Officer Shiver instructed Defendant to stay in front of his car and instructed him not to speak to Castro, who was also leaning against the front of Officer Shiver's car.  (Gov't Ex. 1 at 14:41-14:52).

The interaction was not coercive enough to vitiate the voluntariness of Defendant's consent.  Although Defendant was asked to stand outside the car, no

weapons or handcuffs were used and Defendant was not placed in the back of the car or taken to a police station. The stop was conducted in a public place, and numerous cars and pedestrians passed by during the stop. (Gov't Ex. 1). Officer Shiver kept Defendant's license for the duration of the stop, which is relevant to the analysis, but not dispositive. See United States v. Purcell, 236 F.3d 1274, 1279, 1282 (11thCir. 2001) (finding it not unreasonable for the officer to still possess defendant's license fourteen minutes into a traffic stop where the officer was giving defendant the citation at the time he requested consent to search). The Eleventh Circuit has found much more coercive circumstances to be consensual. See United States v. Freyre-Lazaro, 3 F.3d 1496, 1501 (11th Cir. 1993) (holding mother's consent was voluntary even after seeing her son arrested outside her home); United States v. Hidalgo, 7 F.3d 1566, 1567, 1571 (11th Cir.1993) (holding consent was voluntary even though it was obtained after officers broke into defendant's home, arrested him at gunpoint, and defendant invoked his right to remain silent); Tukes v. Duggar, 911 F.2d 508, 517-18 (11th Cir. 1990) (holding consent was voluntary where defendant with low intelligence was not informed of his right to refuse consent and interrogated at police station); United States v. Garcia, 890 F.2d 355, 361 (11th Cir. 1989) (holding consent was voluntary where officers refused a conditional consent to search and threatened to obtain a search warrant if suspect did not consent to a full search); United States v. Long, 866 F.2d 402, 404 (11th Cir.1989) (holding consent was voluntary where officers threatened to "dig the place up" if defendant refused to consent to the search); United States v. Espinos-Orlando, 704 F.2d

507, 513 (11th Cir. 1983) (holding consent was voluntary despite fact that defendant was stopped at gunpoint, forced to lie on the ground, and one officer had his weapon drawn and pointed at the ground).

Further, Defendant was only detained for approximately thirteen minutes before Officer Shiver requested permission to search the truck.  Defendant appeared to be relaxed and cooperative throughout the stop.  Although Defendant is a young man, he did not appear to have limited capacity.  Defendant stated that he was nineteen years old and not in college, but did not show any signs of limited intelligence on the dash camera video.  (Gov't Ex. 1 at 4:01-4:11).  In addition, Defendant informed Officer Shiver he could read in English and Spanish.  (Gov't Ex. 1 at 2:30-2:34).

Officer Shiver's conversation with Defendant suggested that he wanted to search the truck because of Defendant's prior arrest for attempting to buy marijuana.  Although Officer Shiver did not disclose his suspicion related to the undercover operation, that does not render Defendant's consent involuntary.  See United States v. Spivey, 861 F.3d 1207, 1214 (11th Cir. 2017) (holding that the officers' concealment of one of the purposes of the search was irrelevant to determining whether consent was given voluntarily).  Officer Shiver also informed Defendant of his right to refuse consent, asking him to say no if he did not consent to the search.  The government is not required to inform the defendant that he or she has the right to refuse consent, but providing the information weighs in favor of consent being given voluntarily.  United States v. Pineiro, 389 F.3d 1359, 1366 n.4 (11th Cir. 2004); United States v. Chemaly, 741 F.2d

1346, 1353 (11th Cir. 1984).  After Officer Shiver told Defendant of his right to say no, Defendant appeared to read the consent form, which stated, "I understand that I have the right to refuse to consent to the search . . ." and "My consent is freely and voluntarily given." (Gov't Ex. 2).  Defendant spent thirty seconds looking at the form while Officer Shiver stepped back and out of view of the dash camera.  Afterwards, Defendant seemed to want to explain that he had never touched marijuana, but when Officer Shiver redirected him to the question of whether he consented to the search, he responded "yeah."  After Defendant gave his verbal consent, Officer Shiver directed him to sign the consent form.  Under the totality of the circumstances, the Court finds that Defendant freely and voluntarily consented to the search.

The Court **RECOMMENDS** that Defendant's Motion to Suppress Search and Seizure be **DENIED**.  (Doc. 40).

## II.    SEARCH OF CELLULAR TELEPHONES

In Defendant's Preliminary Motion to Suppress Evidence, Defendant argues that the search warrant authorizing data to be retrieved from the cell phones was not supported by probable cause and was overly broad.  (Doc. 41).  This Court held an evidentiary hearing on the matter on June 5, 2018.  (Doc. 63).  Following the hearing, Defendant prepared a post-hearing brief, but never addressed his former argument that the evidence gathered pursuant to the search warrant should be suppressed.  (See Doc. 68).  Because Defendant never perfected his Preliminary Motion to Suppress Evidence, it has been abandoned.  See United States v. Rosso, No. 3:14-CR-00014-TCB, 2015 WL

34

7115860, at *28 n.26 (N.D. Ga. Nov. 12, 2015); <u>United States v. Cadet</u>, No. 1:11-CR-00522-WBH, 2013 WL 504892, at *9 (N.D. Ga. Jan. 16, 2013), <u>R. & R. adopted</u>, No. 1:11-CR-113-WBH-2, 2013 WL 504815 (N.D. Ga. Feb. 8, 2013); <u>United States v. Chappell</u>, No. 1:10-CR-513-WSD-ECS, 2011 WL 5353016, at *5 (N.D. Ga. May 25, 2011) (deeming argument defendant raised in pre-hearing motion, but did not expound upon in post-hearing briefs, to be waived and abandoned); <u>United States v. Shorr</u>, No. 1:07-CR-182-1-TWT, 2008 WL 655994, at *1 (N.D. Ga. Mar. 10, 2008) (same). Accordingly, the Court **RECOMMENDS** that Defendant's Motion to Suppress Evidence be **DENIED**.  (Doc. 41).

## III.   <u>BILL OF PARTICULARS</u>

On February 13, 2018, Defendant filed a Motion for Bill of Particulars, requesting the names of any unindicted co-conspirators.  (Doc. 44).  On October 31, 2018, the Court ordered the Government to respond to Defendant's Motion for Bill of Particulars by November 13, 2018. (Doc. 78).   The Government responded to Defendant's Motion on November 13, 2018, providing the information requested by Defendant.  (Doc. 80). To date, Defendant has not indicated any objection to the Government's Bill of Particulars.  Therefore, the Court **RECOMMENDS** that Defendant's Motion for a Bill of Particulars be **DENIED as MOOT**.  (Doc. 44).

## <u>CONCLUSION</u>

The Court **RECOMMENDS** that Defendant's Motion to Suppress Search and Seizure, Motion to Suppress Evidence, and Motion for Bill of Particulars be **DENIED**.

35

(Docs. 40, 41, 44). As there are no further motions pending, the undersigned certifies this case ready for trial. The Clerk is directed to terminate the reference to the undersigned.

**SO REPORTED AND RECOMMENDED**, this ___13___ day of December, 2018.

_____
LINDA T. WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)